UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA     )
                             )
                             )
          v.                 ) CR NO. 06-30011-MAP
                             )
MICHAEL J. ZAK, JR.,         )
          Defendant          )

MEMORANDUM REGARDING DEFENDANT'S
MOTION TO SUPPRESS
(Dkt. No. 24)

March 7, 2007

PONSOR, D.J.

I. INTRODUCTION

Defendant Michael J. Zak, Jr. has been charged with
three counts of violating the Migratory Bird Treaty Act
("MBTA"), 16 U.S.C. §§ 703 and 707(a), one count of
violating the Bald and Golden Eagle Protection Act, 16
U.S.C. § 668(a), and one count of conspiring to violate the
MBTA, 18 U.S.C. § 371. On November 16, 2006, he moved to
suppress the fruits of a series of warrant-less searches
directed against him on the ground that U.S. Fish and
Wildlife Service ("USFWS") agents invaded the "curtilage" of
his home and/or commercial operation.

In an order dated February 22, 2007, the court denied

this motion with the minor proviso that USFWS agent Andrey Guidera will not be permitted to offer testimony concerning his observation of two great blue heron decoys on May 6, 2006.  This memorandum will set forth the reasons supporting that ruling.

## II. BACKGROUND

The following facts are largely undisputed.  To the extent any disputes exist, the court has resolved them in Defendant's favor.[1]

A.   The Property.

Defendant lives and works on the southeast quadrant of a sixty-acre parcel of land in Sunderland, Massachusetts. The residential portion of the property is improved by a house, barn, and shed that sit below a row of trees along Route 116, the road that serves as the property's eastern boundary.  Behind Defendant's residence is a tree-covered

---

[1] In light of this resolution, the court determined there was no need to hold an evidentiary hearing before rendering its ruling.  In this circuit, it is well-settled that "[a] hearing is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record."  United States v. Jimenez, 419 F.3d 34, 42 (1st Cir. 2005) (quoting United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996)).

hill that separates the residence from the Mohawk Trout
Hatchery, Defendant's commercial fish growing business.

A narrow driveway, which also serves the residence,
provides vehicular access to the business by extending west
from the house, then curving south at the hill, before
swinging back around the hill to the northwest.[2]

The commercial portion of Defendant's property consists
of a camper, two "Quonset" style buildings,[3] two unprotected
fish ponds, and a series of "raceways" -- rectangular
concrete pools where the fish are raised.  Viewed from
above, the hill sits inside a diamond formed by the
residence to the east, the camper to the south, and the
larger Quonset hut to the west, and the smaller Quonset hut

---

[2] Defendant avers that there is a gate, which he keeps
closed and locked, on this end of the hatchery.  (See Dkt. No.
34, 2nd Zak Aff. 1.)    Although the court does not recall
seeing such a gate during its view of Defendant's property, it
will assume that such a gate exists for the purposes of this
motion.

[3] According to Defendant, the larger Quonset hut contains
"motorized machinery, feed, chemicals, and other items"
essential to the business; the smaller hut is "used to remove
and fertilize trout eggs."    (Dkt. No. 25, Def.'s Mem. in
Support Mot. to Suppress 1.)

to the north.   (See Dkt. No. 33, Ricardi Aff., Ex. 4.)[4]

Because of the hill, the residence cannot be seen from the hatchery, and the hatchery cannot be seen from the residence.  The western-most portion of the residence and the eastern-most portion of the hatchery, i.e. the smaller Quonset hut to the north, are several hundred yards apart.

The hatchery, to which the public does not have access,[5] is completely surrounded by tall hemlock, larch, and pine trees and almost impenetrable foliage.  Several small streams make accessing the business from the heavily wooded, northern portion of Defendant's property difficult, though not impossible.  Depending on the time of year, portions of Defendant's residence and the hatchery can be seen from neighboring farmland to the south.[6]

A barbed wire fence sits beneath a row of trees on the

_____

[4] The western perimeter of the hatchery lies a good distance to the west of the line one can draw on a map from the camper to the larger Quonset hut.

[5] (See Dkt. No. 24, Ex. 1, Zak Aff. ("My business premises are not open to the public.  I receive orders from buyers and deliver my products to purchasers.")

[6] The court is mindful that the government conducted its investigation during seasons in which the foliage is more plentiful than in winter, when the court took its view.

-4-

western perimeter of the business.  To the west of this fence is a dirt road, and to the west of the dirt road are agricultural fields, which constitute a substantial portion of Defendant's property.

The dirt road runs parallel to the barbed wire fence, then turns west at the northern perimeter of the business and runs along the fields until it hits a paved road called Silver Lane.  A chained metal gate prevents vehicular traffic from entering Defendant's property via the dirt road, but determined pedestrians can access the property by working their way through brush on either side of the metal gate.

"No trespassing" signs are visible around the exterior boundary of the property, as well as around the perimeter of the hatchery.  In spite of these signs, trespassers and vandals have entered Defendant's property on an almost annual basis, and he "used to stay in the camper down at the pond in order to guard against the problem."  (Dkt. No. 34, 2nd Zak Aff. 1.)  Defendant keeps the areas around the fish raceways mowed partly to protect his business.

B.    **Fall 2005 Investigation**.

On September 27, 2005, the USFWS received information

from the Massachusetts Environmental Police ("MEP") that

Defendant was killing great blue herons and other protected

birds.   After determining that Defendant had not received

depredation permits to take these species, Agents Guidera

and Thomas Ricardi went to the property and entered through

the brush to the side of the Silver Lane gate.   The two

agents then approached the hatchery by proceeding east on

the dirt road adjacent the agricultural fields.   (Dkt. No.

33, Ex. A, Ricardi Aff. ¶ 2.)   During this first foray onto

Defendant's property, Guidera and Ricardi observed the

remains of numerous great blue herons lying in the brush

under the trees along the western and southern edge of the

business.   (Id. ¶ 3.)[7]

_____

[7] According to Agent Ricardi,

In the fall of 2005, the agricultural fields owned
by [Defendant] off of Silver Lane were planted with
corn.   Guidera and I observed workers in these
fields during that time. . . .   In addition, the
agricultural fields . . . that abut[] the hatchery
were harvested of crops in the fall of 2005 . . . .
Field workers were observed [there] during the crop
harvest in the fall of 2005 . . . .   From both of
these areas, heron carcasses that were lodged in the
tall trees on the edge of the hatchery were visible.

-6-

Two days later, on September 29, 2005, USFWS Agents
Eric Holmes, Patrick Bosco, and Trac Huynh accompanied
Guidera and Ricardi as they once again approached the
hatchery from Silver Lane.  This time, Holmes and Ricardi
set up surveillance behind the larger Quonset hut in the
western corner of the hatchery's perimeter; Bosco and
Guidera conducted reconnaissance from the southwest corner
of the hatchery, and Huynh assumed a position in the woods
just south of the camper.

From these locations, the agents observed Defendant and
several associates perform routine duties related to the
business.  During this period of surveillance, they also
overheard gunfire.

After Defendant and his associates left the area, Huynh
moved east to a spot on the neighboring farmland from which
he could observe Defendant's residence.  The four other
agents then documented and seized the remains of numerous
protected birds along the perimeter of the hatchery.  (Id. ¶
6.)

On October 4, 2005, Guidera and Ricardi returned to the

_____

(Id. ¶ 34.)

-7-

property via the Silver Lane entrance.  When they reached
the western corner of the hatchery, they left the dirt road
and walked north along a stream in the woods.  After passing
the larger Quonset hut, the agents exited the woods, crossed
the fish raceways, and climbed the western slope of the hill
that separated the business from the residence.  (Id. ¶ 7.)
From this vantage point, the agents recorded video of
Defendant attempting to shoot a blue heron from the western
corner of the hatchery.  (Id. ¶ 8.)

        The following morning, October 5, 2005, Guidera arrived
alone and took the same route across the raceways to the
western slope of the hill.  After making observations from
this position for several hours, Guidera crossed back over
the raceways and established a surveillance point in the
woods close to the spot where Defendant had been recorded
the previous day.

        Ricardi subsequently arrived and conducted surveillance
from the northern perimeter of the hatchery before joining
Guidera.  Before dusk, the two agents went into a wooded
area approximately 150 yards northwest of the hatchery where
they discovered additional heron carcasses.  (Id. ¶¶ 9, 10.)

-8-

When the herons left for the winter, the agents suspended their investigation.  The following spring, when the birds returned, so did the agents.

C.   <u>Spring 2006 Investigation</u>.

On March 24, 2006, Ricardi, Guidera, Bosco, and MEP Officer David Unaitis approached the hatchery from a fire road to the north of Defendant's property.  The group once again crossed the raceways and scaled the tree-covered hill. Ricardi and Guidera settled in a spot overlooking the north raceways and smaller Quonset hut, while Bosco and Unaitis made their initial observations from the western slope of the hill.  (<u>Id.</u> ¶ 11.)

Later that day, Unaitis established a position at the top of the hill overlooking Defendant's residence as the three federal agents investigated the perimeter of the hatchery.  During this search, agents located bird remains along the southern and western edge of the business.

On April 26, 2006, Guidera and Ricardi returned to the hatchery by way of the fire road and once again found heron carcasses on its western and southern perimeter.  (<u>Id.</u> ¶ 13.) Ricardi and Holmes seized additional carcasses from roughly

the same spots on May 1, 2006.

The following day, while conducting surveillance from the western slope of the hill, Guidera saw Defendant "pick up an osprey carcass and toss it into the woods." (Id. ¶ 18.) Later that afternoon, Ricardi, Guidera, and Bosco videotaped Defendant attempting to shoot an osprey while standing beside the larger Quonset hut. (Id. ¶ 20.)

On May 6, 2006, Guidera, Ricardi, Holmes, and Bosco once again approached the hatchery from the fire road. Upon arriving at the hatchery's northern perimeter, Bosco and Guidera crossed the fish raceways, then scaled the western slope of the hill; Holmes and Ricardi proceeded to a position at the southern corner of the hatchery not far from the camper. (Id. ¶ 24.)

After Guidera and Ricardi left the property, Holmes and Bosco filmed Co-Defendant Timothy Lloyd ("Lloyd") shoot and kill an osprey. When Guidera and Ricardi returned, Bosco went to the eastern slope of the hill to act as lookout, while the other three agents secured the osprey's remains on the hatchery's western perimeter.

After the agents returned to their original locations,

-10-

>Guidera left his surveillance point on the hill
>and walked down to the large Quonset building.
>Guidera walked around its east, north and west
>sides, making visual observations of the building
>open doors.

(<u>Id.</u> ¶ 26.)

Among other things, Guidera observed "two great blue heron decoys inside the hut."  (Dkt. No. 33, Gov't's Supplemental Mem. in Opp'n to Def.'s Mot. to Suppress 3.)

That same evening, the four agents witnessed Defendant shoot and kill a great blue heron.  With Guidera acting as a lookout on the eastern slope of the hill, Ricardi, Holmes, and Bosco subsequently located the recently killed heron at the western edge of the hatchery.  (Ricardi Aff. ¶ 28.)

D.   <u>Defendant's Arrest</u>.

On May 10, 2006, the government applied for search and arrest warrants with a supporting affidavit from Ricardi, describing in detail the results of the lengthy investigation.  Chief Magistrate Judge Kenneth Neiman granted the government's warrant applications that same day.

The following day, May 11, 2006, USFWS agents, accompanied by state and local law enforcement officers, entered Defendant's property and placed Defendant and Lloyd

-11-

under arrest.  According to Defendant, agents subsequently seized certain items of physical evidence and obtained an inculpatory statement from Defendant.

E.    <u>Travel of the Case</u>.

On November 16, 2006, Defendant filed the pending motion to suppress with an accompanying memorandum of law. After the government filed its opposition, the court heard argument on the motion on January 4, 2007.

During this hearing, the parties agreed that a view of the property would aid the court in resolving any disputed issues of fact.  Following such a view on January 17, 2007 (a bitter cold day), the government submitted an affidavit with photographic evidence detailing the locations from which USFWS agents gathered the evidence that they used to obtain the search and arrest warrants.  Copies of four of these photographs are attached to this memorandum as Exhibits A-D.

During a second hearing on the motion to suppress, Defendant disputed the government's characterization of the measures he had taken to secure his property, and he requested, and received, an opportunity to submit a counter-

-12-

affidavit to establish the need for an evidentiary hearing
on this point.

### III. DISCUSSION

A.   Legal Standard.

While the Fourth Amendment to the United States
Constitution proscribes "unreasonable searches and
seizures," it is well-settled that government intrusions
upon personal privacy only implicate the constitution "if
the challenged conduct infringes upon some reasonable
expectation of privacy." Vega-Rodriguez v. P.R. Tel. Co.,
110 F.3d 174, 178 (1st Cir. 1997) (citing Smith v. Maryland,
442 U.S. 735, 740 (1979)).

To qualify for Fourth Amendment protection, "a privacy
expectation must meet both subjective and objective
criteria: the complainant must have an actual expectation of
privacy, and that expectation must be one which society
recognizes as reasonable." United States v. Burnette, 375
F.3d 10, 16 (1st Cir. 2004) (citation omitted), overruled on
other grounds by 543 U.S. 1181 (2005).

In this case, the government acknowledges that
Defendant had an actual expectation of privacy in locations

-13-

from which federal and state agents conducted surveillance.

The question thus becomes whether this expectation was

objectively reasonable.

To determine the objective reasonableness of an

asserted expectation of privacy, the Supreme Court has

examined

> such diverse factors as the Framers' intent, the
> uses to which an individual has put a location,
> and society's understanding that certain areas
> (say, a person's home) deserve heightened
> protection from government intrusions. . . . But
> the Court has not developed a routinized checklist
> that is capable of being applied across the board,
> and each case therefore must be judged according
> to its own scenario.

Vega-Rodriguez, 110 F.3d at 178 (internal quotation marks

and citations omitted).

Although the Fourth Amendment clearly applies "to

commercial premises, . . . [a]n expectation of privacy in

commercial premises . . . is different from, and indeed less

than, a similar expectation in an individual's home."  New

York v. Burger, 482 U.S. 691, 699-700 (1987) (citations

omitted).  In addition, because "open fields do not provide

the setting for those intimate activities that the [Fourth]

Amendment is intended to shelter from government

-14-

interference or surveillance," the Supreme Court has determined that society has no interest "in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields." Oliver v. United States, 466 U.S. 170, 179 (1984).[8]

The "open fields doctrine" does not apply, however, to "the area immediately surrounding the home." Id. at 178. In determining the applicability of "the curtilage exception to the open fields doctrine," id. at 180 n.11, courts generally consider: (1) "the proximity of the area claimed to be curtilage to the home," (2) "whether the area is included within an enclosure surrounding the home," (3) "the nature of the uses to which the area is put," and (4) "the steps taken by the resident to protect the area from observation by people passing by." United States v. Dunn, 480 U.S. 294, 301 (1987). Ultimately, "the centrally relevant consideration" is "whether the area in question is

---

[8] As one district court has noted, "the phrase 'open field' is a term of art that includes areas which are neither 'open' nor 'fields' as society commonly uses those terms . . . . Thus, an area of land in secluded woods may be an 'open field' in the eyes of the law." United States v. Seidel, 794 F. Supp. 1098, 1102 (S.D. Fla. 1992) (citations omitted).

-15-

so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."  Id.

As the First Circuit has observed, "the contours of the Fourth Amendment are not coterminous with property and trespass law."  Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 64 (1st Cir. 2004) (citing Oliver, 466 U.S. at 183-84). Indeed, "in the case of open fields, the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment."  Id.; see also United States v. Lakoskey, 462 F.3d 965, 973 (8th Cir. 2006) ("[T]he question is not whether the officers were trespassing, but whether [the defendant] had a reasonable expectation of privacy.").

B.   Whether the Government's Investigation Invaded the Curtilage of Defendant's Home.

Applying the Dunn factors to the facts of this case, it is clear that the government did not transgress the curtilage of Defendant's home during the course of its investigation.

1.   Proximity.

In Dunn, the Supreme Court characterized the sixty

yards between the defendant's house and barn as a

"substantial distance" militating against any "inference

that the barn should be treated as an adjunct of the house."

480 U.S. at 302.  In this case, the distance between

Defendant's house and the surveillance points at issue is

even more substantial, as the agents made their observations

several hundred yards from the residence.[9]  Accordingly, the

first Dunn factor favors the government.

    2.   Enclosure.

"Typically, the enclosure factor weighs against those

who claim infringement of the curtilage when their land is

divided into separate parts by internal fencing."  United

States v. Reilly, 76 F.3d 1271, 1278 (2d Cir. 1996).  Here,

although no artificial barriers segregate the residence from

the areas intruded upon, the trees surrounding Defendant's

residence "serve[] to demark a specific area of land

immediately adjacent to the house that is readily

identifiable as part and parcel of the house."  Dunn, 480

---

[9] While agents did observe the residence from "lookout"
positions approximately seventy-five to one hundred yards away
on several occasions, these observations were not used by the
government when it subsequently applied for search and arrest
warrants.  See infra note 11.

U.S. at 302.[10]   "Conversely," the hatchery "stands out as a distinct portion of [Defendant's property], quite separate from the residence."   Id.   Hence, the enclosure factor also weighs against Defendant.

3.   Use.

Unlike United States v. Diehl, 276 F.3d 32 (1st Cir. 2002), where "[t]he evidence of personal, even intimate use . . . was ample," id. at 41, the only evidence of such use in this record is Defendant's sworn statement that he "used to stay in the camper down at the pond in order to guard against [vandalism.]"   (2nd Zak Aff. 1 (emphasis added).) Standing alone, this prior use does not transform the Mohawk Trout Hatchery into an area of intimate activity.

4.   Visibility.

By refusing to let customers on the premises, posting "No Trespassing" signs, erecting fences, and planting trees

---

[10] As the First Circuit noted in United States v. Diehl, 276 F.3d 32 (1st Cir. 2002), in rural locations, a forest can constitute an enclosure for the purposes of the second Dunn factor.   See id. at 40 ("[R]eading the word 'enclosure' in Dunn to require an artificial barrier seems unduly narrow." (citations omitted)); see also United States v. Johnson, 256 F.3d 895, 902 (9th Cir. 2001) ("In rural pieces of property . . . natural boundaries such as thick trees . . . may also indicate an area 'to which the activity of home life extends.'" (citations omitted)).

(see generally 2nd Zak Aff. 1), Defendant clearly took
significant steps to protect the hatchery from observation.
While these protective measures were not always effective
(see id. (conceding that trespassers visited the property on
an annual basis)), the court finds that the final Dunn
factor favors Defendant.

     5.   Conclusion.

The mere fact that Defendant sought to protect the
privacy of his residence and business is not enough to bring
the latter "under the home's 'umbrella' of Fourth Amendment
protection."  Indeed, viewing Defendant's property in its
entirety, the court must conclude that the Mohawk Trout
Hatchery falls outside the curtilage of Defendant's
residence.

C.   Whether the Government's Investigation Invaded the
     Curtilage of the Hatchery.

As noted above, in this case, Defendant contends that
the government not only transgressed the curtilage of his
home, but also the curtilage of his business.  This latter
argument relies almost exclusively upon Dow Chem. Co. v.
United States, 476 U.S. 227 (1986), where the Court, in
permitting the aerial observation of "open areas" of an

-19-

industrial complex, stopped short of abrogating a Seventh
Circuit decision, suppressing evidence found within the
curtilage of a commercial establishment.  Id. at 239 n.7
(citing United States v. Swart, 679 F.2d 698 (7th Cir.
1982)).

        In the two decades since Dow was decided, some courts
have held that the Supreme Court's subsequent decision in
Dunn "implicitly rejected the notion that the open fields
surrounding [a commercial establishment] constitute a
protected curtilage," United States v. Pace, 955 F.2d 270,
276 (5th Cir. 1992), while others have found that "[t]here
may be circumstances in which the area adjoining a business
structure is sufficiently private to enjoy a protection
analogous to a home's curtilage," United States v. Elkins,
300 F.3d 638, 654 (6th Cir. 2002).

        Although neither the Supreme Court nor the First
Circuit has ever explicitly embraced the concept of
"commercial curtilage," the government does not challenge
the concept's viability.  (See Gov't's Supplemental Mem. in
Opp'n to Def.'s Mot. to Suppress 2 ("[I]t appears that the
open fields and curtilage concept applies to both

residential and commercial properties.").)  Instead, it argues that law enforcement officers did not invade the hatchery's curtilage during their numerous trips to the property.

In light of this concession, the court will give Defendant the benefit of the doubt and assume that "[t]he Dunn factors discussed above are also applicable in cases of commercial curtilage."  United States v. Seidel, 794 F. Supp. 1098, 1105 (S.D. Fla. 1992).  However, the court will also assume that "any protection that the Fourth Amendment might afford to [Defendant's] 'commercial curtilage' is less than that which is afforded to the area surrounding a person's home."  United States v. Dellas, 355 F. Supp. 2d 1095, 1102 n.4 (N.D. Cal. 2005) (citing Burger, 482 U.S. at 700).

1.   Proximity.

Aside from Agent Guidera's May 6, 2006 observations from the areas immediately adjacent to the larger Quonset hut, it is unclear, from the parties' submissions, exactly how far government agents were from the camper, Quonset huts, ponds, and raceways when they conducted their

-21-

surveillance.   However, based on the summary of surveillance

points attached to the Ricardi Affidavit (see Ricardi Aff.,

Ex. 27) and the court's own observations during the January

17, 2007 view, it appears that agents gathered the vast

majority of their evidence from locations at least thirty

yards from the clearing that housed the hatchery.[11]

        Significantly, the Diehl court found that a location

eighty-two feet from a residence was not necessarily within

its curtilage.   See 276 F.3d at 39.   Since "business

premises [generally] invite lesser privacy expectations than

do residences," Vega-Rodriquez, 110 F.3d at 178 (citations

omitted), the court finds that this first factor weighs

slightly in the government's favor.

        2.   Enclosure.

        Again, putting aside Guidera's May 6th observations,

all of the incriminating evidence obtained in this case came

_____

        [11] The fact that agents frequently crossed the raceways
and came much closer to the larger Quonset hut in accessing
surveillance points on the western slope of the hill is
irrelevant.   For "it does not matter that officers first
trespass upon property that is obviously curtilage . . . as
long as the incriminating observations themselves take place
outside the protected curtilage."   United States v. Traynor,
990 F.2d 1153, 1157 (9th Cir. 1993) (citations omitted),
overruled on other grounds by United States v. Johnson, 256
F.3d 895 (9th Cir. 2001) (en banc).

-22-

from positions in the woods surrounding the hatchery, i.e. from locations beyond the buildings and the areas around the raceways that Defendant kept mowed.  See Brendan Peters, Note, Fourth Amendment Yard Work: Curtilage's Mow-Line Rule, 56 Stan. L. Rev. 943, 952-55 (2004) (citing instances where "courts have used the mow-line as a stand-in for a fence or enclosure under Dunn's second factor").

Because government agents built their case from spots outside the natural boundary within which the hatchery is ensconced, the second factor also favors the government

3.   Use.

It is undisputed that much, if not most, of Defendant's work occurs in and around the raceways and ponds.  By the same token, it appears that Defendant conducts little, if any, of his business in the woods surrounding the hatchery. Consequently, the third Dunn factor strongly suggests that the curtilage of the hatchery encompasses the entire clearing, but does not extend into the surrounding woods.

4.   Visibility.

As noted above, Defendant took some fairly extensive measures to protect the hatchery from observation.  This

-23-

case is therefore distinguishable, in this regard, from
United States v. Hall, 47 F.3d 1091 (11th Cir. 1995), where
the court "refuse[d] to apply the so-called 'business
curtilage' concept" due to the failure of a "commercial
proprietor [to] take affirmative steps to exclude the
public." Id. at 1097. This factor appears therefore to
favor Defendant somewhat.

    5.   Summary.

    Based on the foregoing, it is apparent that the
hatchery's curtilage includes the clearing, but does not
extend into the surrounding forest. Since Agent Guidera
transgressed the curtilage of the business when he looked
inside the larger Quonset hut, the court will not permit him
to testify about the two great blue heron decoys he
observed.[12]

    Having determined the extent of the hatchery's
curtilage and the fact that Guidera violated it on May 6,
2006, the court must now consider: (1) whether the
government's decision to seek a search warrant was prompted

――――――――――――――

    [12] At this point, it is unclear both whether the
government obtained the two decoys during the execution of the
search warrant, and, if so, whether it intends to offer them.

-24-

by Agent Guidera's illegal search; and (2) "whether the affidavit contained sufficient facts to support probable cause when the offending facts were excised."  United States v. Dessesaure, 429 F.3d 359, 367 (1st Cir. 2005) (citation omitted).

"To determine whether the warrant was independent of the illegal entry, one must ask whether it would have been sought even if what actually happened had not occurred." Id. at 369 (quoting Murray v. United States, 487 U.S. 533, 542 n.3 (1988)).

The government asserts that Agent Ricardi's decision to seek a search warrant had little to do with the fruits of Agent Guidera's illegal search.  Although Dessesaure recognized that district courts are "not bound by after-the-fact assurances of [an agent's] intent," the government's assurance in this instance hardly appears "implausible."  Id. (citing Murray, 487 U.S. at 540 n.2).

Indeed, by the time Guidera observed the heron decoys, USFWS agents had: (1) received information from the MEP that Defendant was killing protected birds; (2) collected scores of migratory bird carcasses from Defendant's property;

-25-

(3) observed Defendant shooting at a blue heron; (4)
witnessed Defendant toss the remains of an osprey into the
woods; and (5) seen Co-Defendant Lloyd shoot and kill an
osprey.  In light of the length and breadth of the agents'
investigation and the evidence it uncovered, it seems all
but certain that Ricardi would have sought the warrant
regardless of the results of Guidera's illegal search.

The evidence summarized above would also have been more
than sufficient to constitute probable cause.  Indeed, the
legally obtained evidence supporting a finding of probable
cause appears much stronger in this case than it did in
Dessesaure, where the First Circuit nonetheless reversed the
district court's ruling in favor of the defendant.  Cf. id.
at 368-69.

In short, the court finds that "[t]he facts gathered
legally, without resort to the facts gathered illegally,
provided an independent and adequate source for the warrant
application."  Id. at 370.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to
Suppress was DENIED on February 22, 2007, with the minor

proviso that agent Guidera will not be permitted to offer testimony concerning his observation of two great blue heron decoys on May 6, 2006.  Counsel will appear for trial on March 26, 2007, at 8:30 a.m.

    It is So Ordered.

                        **MICHAEL A. PONSOR**
                        U. S. District Judge